UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CLIFTON S. WITHERSPOON,

                    Petitioner,

v.

RANDEE REWERTS,

                    Respondent.

_____/

Case No. 1:20-cv-730

Honorable Robert J. Jonker

## OPINION

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Clifton S. Witherspoon is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan.  On October 30, 2015, following a five-day jury trial in the Kent County Circuit Court, Petitioner was convicted of armed robbery and conspiracy to commit armed robbery, in violation of Mich. Comp. Laws § 750.529, first-degree murder, in violation of Mich. Comp. Laws § 750.316, and use of a firearm during the commission of a felony (felony-firearm) second offense, in violation of Mich. Comp. Laws § 750.227b.  On December 3, 2015, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to prison terms of 35 to 90 years for armed robbery and conspiracy to commit armed robbery and life for first-degree murder.  Those sentences were to be served consecutively to a sentence of 5 years' imprisonment for felony-firearm.[1]

---

[1] According to OTIS, Petitioner is also serving a sentence of 20 to 80 years for perjury based on lies he told while testifying in response to an investigative subpoena relating to the crimes of armed robbery, etc. at issue in the present petition.  Petitioner was convicted and sentenced for the perjury charge before he was tried, convicted, and sentenced for the present crimes.  Additionally, Petitioner is serving sentences for assault with intent to commit murder (AWIM) and felony firearm offenses committed on November 13, 1996.  Petitioner was out on parole for those crimes when he committed the present crimes.  The sentences for the present crimes are consecutive to the sentences for the 1996

On August 3, 2020, Petitioner filed his habeas corpus petition raising four grounds

for relief, as follows:

I.      The Equal Protection Clause of the Fourteenth Amendment was violated
        when the prosecutor removed Juror Quinn on the basis of race.

II.     Petitioner was denied his Sixth and Fourteenth Amendment rights to the
        effective assistance of counsel where his trial lawyer failed to

        (A) argue and preserve the *Batson* challenge;

        (B) object to the following prosecutorial misconduct

                (1)  improper vouching and bolstering,

                (2)  the use of false and perjured testimony, and

                (3)  misstating the evidence in closing;

        (C) present evidence to establish that the prosecution did not exercise due
        diligence in an effort to produce Darrin Gibson at trial as Petitioner's
        constitutional right to a fair trial, to confront the witness against him, and to
        present a defense were violated where the preliminary examination
        testimony of Darrin Gibson was read into the record during trial;

        (D) present several witnesses and other evidence that would have supported
        the strategically chosen defense;

        (E) object to the admission of Ann Hunt's DNA testimony or force the
        prosecutor to present the lab report to the jury;

        (F) consult the available literature to rebut the prosecutor's expert testimony
        on cell phone analysis; and

        (G) if individually the above claims of ineffective assistance of counsel do
        not establish that Petitioner was prejudiced by counsel's actions, Petitioner
        asserts that the cumulative effect does.

III.    Petitioner is entitled to a new trial based on the new evidence which shows
        that Kerwin Winters and Quinn Isaac were never arrested.

---

AWIM/felony-firearm convictions.  The consecutive sentence string for the present crimes is concurrent with the
sentence for the perjury crime.  Petitioner pursued his state court appeals for those separate proceedings in parallel.
He filed a habeas petition on the perjury offense.  *Witherspoon v. Rewerts*, No. 1:20-cv-729 (W.D. Mich.).  The Court
dismissed that petition without prejudice under the concurrent sentencing doctrine.

IV.    Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel where Argument I, II, and III were not raised on direct appeal.

(Pet., ECF No. 1, PageID.12, 14, 16, 18.)   Respondent asserts that Petitioner's claims are procedurally defaulted and lack merit.   (ECF No. 7.)   For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, dismiss his petition for writ of habeas corpus.

<u>Discussion</u>

## I.    Factual Allegations

The court of appeals' opinion regarding the convictions at issue does not describe the facts underlying Petitioner's convictions, but the court of appeals in Petitioner's related perjury case noted the following:

> This appeal arises from a homicide that occurred near the Chicken Coop restaurant in Grand Rapids, Michigan in the early morning hours of September 21, 2013.  On that date, Rick [Hammad] was killed when he suffered four gunshot wounds to his abdomen, lower back, upper leg and the base of his thumb.  An autopsy revealed that the lethal shots had been fired from close range.  An investigative subpoena was obtained by police and [Petitioner] was interviewed on September 11, 2014. While under oath, [Petitioner] stated that he went to the Chicken Coop restaurant once the night of the slaying.  [Petitioner] also told police that he was driven to the "Cocktailz Bar" by a person named "Trenton" in a black Malibu. [Petitioner] also informed police during the interview that on the day and night in question he had been drinking and smoking marijuana such that he was "high as hell."

*People v. Witherspoon*, No. 329964, 2017 WL 786886, at *1 (Mich. Ct. App. Feb. 28, 2017).  The Court supplements these facts with relevant information from the trial court record below.

Petitioner appeared before the trial court for a preliminary examination on May 5, 2015. (ECF No. 8-2, PageID.141.)  During the preliminary examination, the prosecution presented testimony from Darrin Gibson.  (*Id.*, PageID.166–225.)   At that time, Gibson was serving a sentence of three to ten years for retail theft in the Michigan Department of Corrections (MDOC). (*Id.*, PageID.167.)  Overall, Gibson testified that he had encountered Petitioner while they were

3

both incarcerated at the same institution and that Petitioner had talked to him about his involvement in the offenses set forth above.  (*Id.*, PageID.166–225.)

Jury selection for Petitioner's trial began on October 26, 2015.  (ECF No. 8-4, PageID.288.)   During *voir dire*, Juror Quinn indicated that she had a brother who had been convicted of drug possession four years ago and was at that time serving his sentence in Pennsylvania.  (*Id.*, PageID.306.)  She could not recall what type of drugs were involved.  (*Id.*, PageID.307.)  The prosecution used a peremptory challenge to strike Juror Quinn.  (*Id.*)  After the jury had been seated, defense counsel noted that Juror Quinn, an African-American woman, had indicated that she could be fair and "ma[de] a *Batson* challenge for the prosecutor to show some non-race reason why she was excused."  (*Id.*, PageID.312.)   The prosecutor noted his reason stemmed from the fact that Juror Quinn had a "brother that was convicted on a drug offense in federal court fairly recently," and that "given the nature that this particular case is involving drug transactions," he did not believe she should remain on the jury.  (*Id.*)  The prosecutor also noted that "the juror in seat number 42, Ms. Belton, is also African American, and I'd certainly have no objection to her."  (*Id.*)  He also noted that Juror Quinn's brother was still in federal prison.  (*Id.*)  The trial court concluded that the reason provided was a reasonable basis to excuse Juror Quinn and that there was no prejudice to Petitioner.  (*Id.*)

The prosecutor also raised an objection to several witnesses identified by Petitioner and his counsel, arguing that the witnesses should not be allowed to testify because of failure to comply with state discovery rules.  (*Id.*)  Petitioner's counsel asserted that "a number of those witnesses are listed on the Information and certainly no surprise to the prosecutor."  (*Id.*)  The trial court excluded from testifying all witnesses that had not been timely identified and who were not already on the prosecution's list of witnesses.  (*Id.*, PageID.313.)

4

Kyle Grant was one of the primary crime scene technicians who responded to "the scene at Dickinson and Lindon" on September 20, 2013.  (ECF No. 8-5, PageID.327.)  By the time he arrived, Hammad had already been transported away by medical personnel.  (*Id.*)  Upon arriving at the scene, he found a Ford F150 truck, in which was found a .45 caliber magazine, some fired bullets, and a .40 caliber fired shell casing.  (*Id.*, PageID.328, 331.)  He also found a MetroPCS cellphone on the dashboard.  (*Id.*, PageID.330.)

Hammad's cousin, Samir Hamed, testified that he and Hammad had run a medical marijuana dispensary together.  (*Id.*, PageID.332–333.)  He testified about seeing Hammad with "large amounts of cash" on his person on several occasions; "[i]t could be from $1,000 in cash to $10,000 in cash."  (*Id.*, PageID.333.)  Hamed denied knowing anything about Hammad illegally selling marijuana.  (*Id.*, PageID.334.)

Anna Spicer testified that she lived in the area where the incident occurred, and that her neighbor knocked on her door late that night and told her that someone was lying on the lawn.  (*Id.*, PageID.351.)  She went outside and saw a gentleman bleeding.  (*Id.*)  She asked for his name; he responded "Rick."  (*Id.*)  Ms. Spicer asked him what happened, and Hammad said, "three guys."  (*Id.*)

Jacub Amsis testified that he owns the Alger Quick Stop at the corner of Alger and Eastern.  (*Id.*, PageID.361.)  He testified that Hammad was a good friend and that on the day of his murder, he asked to borrow Amsis' truck.  (*Id.*)  Amsis found that odd because Hammad had never asked to borrow the truck before.  (*Id.*, PageID.362.)  He testified that Hammad never returned that night, and that he kept calling Hammad with no response.  (*Id.*)  Eventually, he called the police and was told they had his truck but could not tell him what happened to Hammad.  (*Id.*)

Julie Timmer testified that she and her husband owned the Chicken Coop, where Karla Crawford, *neé* Witherspoon, was an employee and had worked on September 20–21, 2013. (ECF No. 8-6, PageID.380–381.) Detective Purlee testified that during his investigation, he reviewed surveillance video from the Chicken Coop. (*Id.*, PageID.383–385.) Video from September 20, 2013, showed that Petitioner had been wearing a white shirt, black pants, and black vest. (*Id.*) He entered the Chicken Coop at 10:26 p.m. and then left in a Dodge Durango. (*Id.*) He returned, wearing different clothing, at 2:15 a.m. and returned a key to Crawford. (*Id.*) Detective Purlee obtained a certificate of title indicating that the Durango belonged to Crawford. (*Id.*, PageID.382.) He also obtained video from the Alger Quick Stop, which showed Hammad leaving the store that night at 11:22 p.m., and the Ford F150 truck leaving the lot at 11:23 p.m. (*Id.*, PageID.382.)

James Mayberry testified that at the time of Petitioner's trial, he was facing pending drug charges and had received immunity for any charges stemming from the incident of September 20, 2013, in exchange for his testimony. (*Id.*, PageID.388–389.) Mayberry knew both Petitioner and Hammad. (*Id.*, PageID.389.) Mayberry knew that Hammad had large amounts of marijuana and carried around large amounts of cash and set him up to be robbed. (*Id.*) He told Petitioner that it would be a "good lick," and Petitioner went along with the plan. (*Id.*, PageID.390.)

Mayberry and Petitioner met Hammad at Joe's Party Store on September 19, 2013, and they saw about two pounds of marijuana in the trunk of Hammad's car. (*Id.*) They agreed to meet later for the deal. (*Id.*) The next evening, Mayberry spoke to Petitioner, who said that he was at the Chicken Coop waiting for Hammad. (*Id.*, PageID.391.) Mayberry told Petitioner and whoever he was with not to hurt Hammad. (*Id.*) Mayberry tried calling Petitioner and Hammad for the rest of the night but got no answer from either. (*Id.*, PageID.392.) He was eventually able

6

to get in contact with Petitioner, and Petitioner told him that the individual he was with panicked, fought with Hammad, and then fired a gun at him.  (*Id.*, PageID.393.)  Petitioner then shot Hammad in the leg.  (*Id.*)  They did not get any marijuana because Hammad had not brought it with him. (*Id.*)

Benjamin Donaldson testified that he knew both Hammad and Mayberry.  (*Id.*, PageID.405.)  Donaldson stated that he was with Mayberry on the night of September 20, 2013. (*Id.*)  Donaldson was "fresh out of prison," and he picked Mayberry and Mayberry's girlfriend up to spend time at Donaldson's "girl's mom's house."  (*Id.*)  Eventually, they went to a football game, and Mayberry and Donaldson left and went to Joe's Party Store and met Petitioner.  (*Id.*, PageID.406.)  Donaldson went into the store and got back in the van.  (*Id.*)  He saw Mayberry and Petitioner walk up and down on the sidewalk outside the store.  (*Id.*)  Petitioner "walked back around the corner and disappeared," and Mayberry got back into the van and said that they had to meet Petitioner around the corner.  (*Id.*)  Petitioner eventually returned, and Donaldson saw Petitioner give Mayberry a bag of marijuana, and Mayberry and Donaldson "pulled off and went back to the football game."  (*Id.*, PageID.407.)  Donaldson testified he never saw Petitioner again. (*Id.*)

Jade Robertson testified that she knew Petitioner through Rosetta Brooks, Petitioner's girlfriend at the time.  (*Id.*, PageID.414.)  She also testified that she knew Jackie Johnson through Brooks.  (*Id.*)  Robertson testified that it was Brooks's birthday the weekend of September 20, 2013, and that the three of them were going to Cocktailz to celebrate.  (*Id.*) Robertson testified that the three of them arrived at Cocktailz around 10:00 or 11:00 p.m.  (*Id.*, PageID.415.)  Petitioner pulled into the parking lot in a black truck around "maybe 11:00, somewhere in there, close to midnight maybe."  (*Id.*)  Robertson remembered Petitioner speaking

to Brooks, and afterwards Johnson asked if Robertson wanted to go home because she was "too drunk to even go inside the bar."  (*Id.*)  They took Robertson back to Brooks's house.  (*Id.*) Robertson testified that Brooks seemed "kind of annoyed" after Petitioner showed up.  (*Id.*) She also thought there "may have been someone in the passenger seat" of Petitioner's vehicle.  (*Id.*) On cross-examination, Robertson testified that Petitioner had been wearing a white shirt and vest. (*Id.*, PageID.417.)

Jackie Johnson testified that the three women arrived at Cocktailz a "little bit after 12:00."  (*Id.*, PageID.419.)  Johnson parked the car, and Petitioner pulled up in front of her before she even had the car turned off.  (*Id.*)  She testified that Petitioner was driving a Dodge Durango. (*Id.*)  Brooks got out to talk to Petitioner, and she came back to Johnson's car "very angry."  (*Id.*, PageID.420.)  Brooks said that she "wasn't going in the bar."  (*Id.*)  On cross-examination, defense counsel elicited that Johnson had testified in her investigative subpoena hearing that they had not left for Cocktailz until 12:45 a.m. or closer to 1:00 a.m.  (*Id.*, PageID.421.)

Karla Crawford testified that Petitioner was her older brother, that she owned a black Dodge Durango, and that she had worked at the Chicken Coop the night of September 20, 2013.  (*Id.*, PageID.422.)  She indicated that she had been charged with perjury because during her investigative subpoena hearing, she had stated that Petitioner had only visited her at the Chicken Coop once that evening, and that she had not loaned the Durango to him.  (*Id.*, PageID.422–423.) Crawford testified that both of those responses had been lies.  (*Id.*, PageID.423.)

Ann Hunt, an employee with the Michigan State Police Department of Forensic Science, was qualified as an expert witness in the area of DNA analysis. (ECF No. 8-7, PageID.431.)  Ms. Hunt analyzed several swabs, including buccal swabs from Petitioner and Kenwin Winters, as well as swabs from vehicle doors, a .45 magazine, three cigarette butts, jeans,

and Hammad's pants pocket.  (*Id.*, PageID.433.)  She determined that Petitioner could not be excluded as a possible donor of the DNA located in Hammad's pants pocket, as well as the DNA picked up from the interior passenger side door.  (*Id.*, PageID.433–434.)  The comparison of the swab from the .45 magazine to Petitioner's swab was inconclusive.  (*Id.*, PageID.434.)  Hammad's blood was located on the .45 magazine, and Ms. Hunt testified that it was possible that Petitioner had been a minor donor who was "diluted out" to the point of being uninterpretable.  (*Id.*, PageID.435.)

After Ms. Hunt's testimony, the prosecutor noted the State's inability to produce witness Gibson, "who was recently paroled, and I mean recently as in this month."  (*Id.*, PageID.436.)  The prosecution asked that witness Gibson be declared unavailable and presented testimony from Victim/Witness Advocate Noemi Aguilar about her efforts to obtain Gibson's presence.  (*Id.*, PageID.436–437.)  She testified that witness Gibson had been released on October 13, 2015, and that he had been listed as an absconder for failing to check in to a homeless shelter in Jackson County.  (*Id.*, PageID.437.)  Defense counsel argued that witness Gibson should not be deemed unavailable because the state had "ample notice to make him available" and efforts to do so "appear[ed] to have not begun until after October 13."  (*Id.*)  The trial court disagreed and found that witness Gibson was unavailable.  (*Id.*)

The prosecution also played the video of Petitioner's investigative subpoena interview.  (*Id.*, PageID.439–466.)  During that interview, Petitioner denied knowing Hammad and that he ran a marijuana dispensary.  (*Id.*)  Petitioner testified that on the evening of September 20, 2013, he was with Rosetta Brooks, and later was with two males, Chubbs and Tay, with whom he smoked marijuana.  (*Id.*)  Petitioner was also drinking and was "high as hell."  (*Id.*)  He testified that at one point while in the car with Chubbs and Tay, they pulled out guns and took his cellphone

and cash.  (*Id.*)  Petitioner learned of Hammad's death on September 21, 2013; he denied killing

Hammad.  (*Id.*)  He also denied borrowing a car from Crawford and denied seeing Kenwin Winters

that night.  (*Id.*)

Gibson's preliminary examination testimony was then read into the record.  (*Id.*,

PageID.471–484.)  Gibson said that Petitioner told him that he had lied to police about going to

the Chicken Coop and borrowing a vehicle from his sister as well as about being robbed by Chubbs

and Tay, and that Petitioner said he had made up the names Chubbs and Tay.  (*Id.*, PageID.472–

474.)  Petitioner told Gibson that he got his cousin "Mane" to assist with the robbery of Hammad,

and that Mane brought a friend, "Quinn."  (*Id.*, PageID.474.)

Petitioner told Gibson that he and Mane had met with "an Arab guy," but that the

individual had not brought the marijuana.  (*Id.*, PageID.475.)  An argument broke out while they

were inside Hammad's truck because Mane "jumped the gun" and started reaching into Hammad's

pockets.  (*Id.*)  Hammad fought back, and Petitioner shot him once, then shot him again.  (*Id.*)

Petitioner pulled Hammad from the truck and went through his pockets, finding $600.00.  (*Id.*,

PageID.476.)  Petitioner and Mane took Hammad's watch, and Quinn picked them up.  (*Id.*)

Petitioner told Gibson that he had dropped his cellphone and accidentally picked up Hammad's

phone.  (*Id.*, PageID.482.)  Petitioner, Mane, and Quinn went to Petitioner's mother's house and

divided the money.  (*Id.*, PageID.476.)  Petitioner changed because his clothes had bloodstains on

them, and he returned the car to his sister at the Chicken Coop.  (*Id.*)

The prosecution also presented expert testimony from Detective DeVries regarding

cell phone analysis.  (ECF No. 8-8, PageID.488–493.)  He testified that he analyzed cell phone

records for four phones, including Petitioner's.  (*Id.*, PageID.490.)  According to the records, the

phone using Petitioner's number made several phone calls within close vicinity to the Chicken

Coop on the night in question.  (*Id.*, PageID.490–491.)

The jury reached a guilty verdict after deliberating for one afternoon.  (*Id.*,

PageID.507–508.)  Petitioner appeared before the trial court for sentencing on December 3, 2015.

(ECF No. 8-9.)  Petitioner, with the assistance of counsel, directly appealed his convictions and

sentences, raising the following issues:  (1) his rights to a fair trial and to confront the witnesses

against him were violated when the trial court permitted the preliminary examination testimony

from witness Darin Gibson to be read into the record; (2) his right to effective assistance of counsel

to present his defense were violated when the trial court prohibited Petitioner from presenting

testimony from several witnesses; and (3) his judgment of sentence needed to be corrected to

reflect that only his sentence for the murder conviction was to be served consecutively to the

felony-firearm sentence.  *People v. Witherspoon*, No. 331533, 2017 WL 1967478, at *1–4 (Mich.

Ct. App. May 11, 2017).  The court of appeals rejected Petitioner's first two claims but agreed that

only his sentence for murder was to be served consecutively.[2]  *Id.*  Petitioner filed a *pro per*

application for leave to appeal to the Michigan Supreme Court, raising several new issues,

including his equal protection challenge to Juror Quinn.  (ECF No. 8-11, PageID.634–662.)  The

supreme court denied leave by order entered October 3, 2017.  (*Id.*, PageID.633.)

Petitioner filed a motion for relief from judgment on December 26, 2018.

(ECF No. 8-1, PageID.139.)  Petitioner sought to raise the issues set forth in his habeas grounds

above.  (ECF No. 1-1, PageID.33.)  In an order entered May 30, 2019, the Kent County Circuit

Court denied Petitioner's motion after concluding that he had failed to demonstrate good cause for

---

[2] It was somewhat of a Pyrrhic victory for Petitioner to be permitted to serve his 35 to 90 years sentences for armed robbery concurrently with his 5-year felony-firearm sentence and have ***only*** the commencement of his life sentence await completion of the 5-year term.

failing to raise his issues on direct appeal or actual prejudice.  (*Id.*, PageID.32–35.)  Petitioner

applied for leave to appeal that decision in the Michigan Court of Appeals and the Michigan

Supreme Court.  Those courts denied leave by orders entered January 23, 2020, and April 29, 2020,

respectively.  (ECF No. 8-12, PageID.676; ECF No. 8-13, PageID.970.)  Petitioner subsequently

filed a motion for reconsideration, which the supreme court denied by order entered July 28, 2020.

(ECF No. 8-13, PageID.965–968.)  This petition followed.

## II.    Procedural Default

Respondent argues that this Court's review of Petitioner's first three habeas

grounds is barred by the doctrine of procedural default.  (ECF No. 7, PageID.62, 115.)  There are

two types of procedural default.  First, procedural default can occur pursuant to state law.  When

a state law default prevents further consideration of a federal issue by the state, the federal courts

ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v.

Nunnemaker*, 501 U.S. 797, 801 (1991).  To determine whether a petitioner procedurally defaulted

a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply

with an applicable state procedural rule, (2) the state court enforced the rule so as to bar the claim,

and (3) the state procedural default is an "independent and adequate" state ground properly

foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub*, 377

F.3d 538, 551 (6th Cir. 2004).  To determine whether a state procedural rule was applied to bar a

claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim.  *See

Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291–92 (6th Cir. 2010).

Second, procedural default may occur if Petitioner failed to raise a federal issue in

the state courts.  Before the Court may grant habeas relief to a state prisoner, the prisoner must

exhaust remedies available in the state courts.  *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*,

526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so

that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–78 (1971). Failure to fairly present an issue to the state courts is a problem only if a state court remedy remains available for the petitioner to pursue. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). If no further state remedy is available, the petitioner's failure to exhaust does not bar relief, but the claim may be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

If a petitioner procedurally defaulted his federal claim, the petitioner must demonstrate either (1) cause and prejudice—cause for his failure to comply with the state procedural rule (or fairly present the issue in the state courts) and actual prejudice flowing from the violation of federal law alleged in his claim—or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986); *Hicks*, 377 F.3d at 551–52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536–37. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Respondent asserts that Petitioner has procedurally defaulted habeas grounds I, II, and III. To show cause sufficient to excuse a failure to raise those claims, Petitioner must point to "some objective factor external to the defense" that presented him from raising the claims. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Factors that may

13

establish cause include interference by officials, attorney error rising to the level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004) (quoting *McCleskey*, 499 U.S. at 493–94) (quotations omitted)).  Here, Petitioner offers as "cause" the ineffective assistance of his appellate counsel. Moreover, in habeas ground III, Petitioner essentially asserts a claim of actual innocence.

The showing necessary to establish ineffective assistance of counsel as "cause" is the same showing necessary to establish an independent claim of ineffective assistance of counsel: the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  A court considering a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if a court determines that counsel's performance, in light of the circumstances as they existed at the time of counsel's action, was outside the wide range of reasonable professional assistance, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 690–91.  Thus, determining whether counsel rendered ineffective assistance because he or she failed to raise a claim necessarily involves some inquiry into the merits of the claim that counsel failed to raise.

The Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *Lambrix v.*

*Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix* and *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997)). Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215–16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) ("[T]he procedural default raises more questions than the case on the merits. We will therefore assume without deciding that there was no procedural default by petitioner and decide the merits of the case."); *Watkins v. Lafler*, 517 F. App'x 488, 498 (6th Cir. 2013) ("[T]he district court specifically noted that it chose not to address these [procedural default] arguments and rather assumed that no procedural default existed because "the procedural default issue raises more questions than the case on the merits.' . . . Given the variety and complexity of the defaults involved . . . we do likewise."). It is simpler to resolve all of Petitioner's habeas grounds on the merits. The Court, therefore, will forego the procedural default analysis.

## III.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the

15

Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court

can review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"— for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.   Discussion

### A.   *Batson* Challenge[3]

Petitioner first contends that his equal protection rights were violated when the prosecutor used a peremptory challenge to remove Juror Quinn from the jury.  (ECF No. 1, PageID.12.)  Petitioner maintains that he is "entitled to have the trial court conduct the third step of the *Batson* analysis."  (*Id.*)  He acknowledges that the prosecutor "provided a race-neutral reason for removing Juror Quinn."  (ECF No. 8-12, PageID.703.)  Petitioner argues, however, that the prosecutor did not peremptorily strike an unidentified juror whose brother had been involved in "several assaults 25 to 30 years earlier."  (*Id.*, PageID.704.)  Petitioner asserts that "the unidentified juror who had a brother that was involved in several assaults would likewise be relevant to the 'nature [of] this particular case' which involved an assault."  (*Id.*, PageID.705.)  He alleges that the "stark contrast between how the prosecutor questioned Juror Quinn (an African-American) and

---

[3] The Kent County Circuit Court did not address this claim on the merits.  Instead, the court concluded that Petitioner had failed to establish cause for failing to raise the issue on direct appeal, or prejudice.  Because the state court resolved this issue on the ground of a procedural default, the state court did not adjudicate the *Batson* claim on the merits.  Accordingly, this Court's review of the *Batson* issue is *de novo*.  The same is true for the first three of Petitioner's four habeas issues.  They were all raised for the first time on collateral review and the state court denied relief on the ground of procedural default.  Because Petitioner's fourth issue—ineffective assistance of appellate counsel—was offered, and rejected, as cause for the procedural default, the state court resolved that issue on the merits.  That adjudication is entitled to AEDPA deference.

the unidentified juror (not an African-American) is a clear indication that his stated reason for striking Juror Quinn was 'a sham and a pretext for discrimination.'" (*Id.*, PageID.706.)

In *Batson v. Kentucky*, 476 U.S. 79, 96, (1986), the Supreme Court articulated a three-step analysis to be applied to an Equal Protection Clause claim that purposeful discrimination occurred in the selection of the petit jury based solely on the prosecutor's exercise of his peremptory challenges at trial. *See United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002). First, the Defendant must establish a prima facie case of racial discrimination. *See United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003). This requires an initial showing that "the defendant . . . is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. at 96 (citation omitted). "[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Id.* (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). Ultimately, the Defendant, relying on this presumption and other facts, must "raise an inference that the prosecutor used [the practice of peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.*

Second, once the Defendant has raised the necessary inference, "the burden shifts to the state to come forward with a neutral explanation for challenging [potential] jurors." *Id.* at 97. "The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather it need only demonstrate that its reasons were race-neutral." *Copeland*, 321 F.3d at 599. More specifically, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible. 'At this . . . step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the

prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

Third, the party opposing the strike must demonstrate that the prosecutor's purported explanation is merely a pretext for racial motivation. *See McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001) (describing *Batson* test). Ultimately, the court must determine "whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359. In making this determination, the Court presumes that the facially valid reasons proffered by the prosecution are true. *Id.* at 359–60. Racially discriminatory purpose or intent must be affirmatively shown by the opponent of the strike. *Id.* at 360. The ultimate burden of persuasion always remains with the opponent of the strike. *See United States v. McFerron*, 163 F.3d 952, 955 (6th Cir.1998).

Notwithstanding this three-part test, however, the Supreme Court has held that the question of whether a prima facie case has been established becomes moot once a court rules on the ultimate question under *Batson* of whether there was purposeful discrimination. *Hernandez*, 500 U.S. at 360; *Lancaster v. Adams*, 324 F.3d 423, 432-33 (6th Cir. 2003). "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court had ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359; *Lancaster*, 324 F.3d at 433.

Respondent maintains that Petitioner "did not even meet the first step of *Batson*, the prima facie showing." (ECF No. 7, PageID.96.) Respondent points out that "there was another Black juror that the prosecutor did not strike." (*Id.*, PageID.97.) The prosecution did exercise another peremptory strike, but "given that [Petitioner] did not make a record of the race of that

juror, it is fair to presume he was not Black." (*Id.*)  This Court agrees with Respondent.  The Sixth Circuit recently noted that "[e]xcluding one Black juror without any additional allegations of discriminatory intent does not amount to a prima facie *Batson* claim."  *United States v. Hall*, 20 F.4th 1085, 1097 (6th Cir. 2021) (citing *United States v. Mahbub*, 818 F.3d 213, 224 (6th Cir. 2016)).  At trial, the defense offered nothing more with respect to allegations of discriminatory intent regarding the prosecution's strike of Juror Quinn.

Petitioner suggests that the trial court should have considered the fact that the prosecution did not strike an unidentified juror whose brother had been involved in "several assaults 25 to 30 years earlier."  (ECF No. 8-12, PageID.704.)  Petitioner does not identify that juror's race; presumably, that juror was Caucasian.  The Supreme Court has cautioned that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial."  *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008).  Here, the unidentified juror indicated that his brother "was involved in several assaults but this was many years ago."  (ECF No. 8-4, PageID.295.)  When asked for further information, the juror indicated that the assaults had occurred 25 to 30 years ago.  (*Id.*)  By contrast, Juror Quinn indicated that her brother had recently been convicted of drug crimes and at the time was still incarcerated in federal prison.  (*Id.*, PageId.306–07.)  Thus, while Juror Quinn and the unidentified juror both had brothers who had been involved with the criminal justice system, they were not similarly situated given that Juror Quinn's brother was still serving his sentence and 25–30 years had passed between the assaults in which the unidentified juror's brother had been involved and Petitioner's trial.

In sum, Petitioner has not demonstrated a *prima facie* case of racial discrimination. Moreover, the prosecutor's explanation was race-neutral, and the trial court found that the fact that Juror Quinn's brother was still incarcerated in a federal prison was a reasonable basis to excuse

her.  (*Id.*, PageID.312.)  Petitioner has not satisfied his burden to overcome the trial court's factual

finding.  *See Davis v. Ayala*, 576 U.S. 257, 271 (2015) (noting that "a trial court finding regarding

the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to

great deference" (internal quotation marks omitted) (quoting *Felkner v. Jackson*, 562 U.S. 594,

598 (2011))).  Petitioner's first habeas ground will, therefore, be dismissed.

     **B.**    **Ineffective Assistance of Trial Counsel**

        In *Strickland*, 466 U.S. at 668, the Supreme Court established a two-prong test by

which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective

assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an

objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the

defendant resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687.  A court

considering a claim of ineffective assistance must "indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The

defendant bears the burden of overcoming the presumption that the challenged action might be

considered sound trial strategy.  *Id.* (citing *Michel*, 350 U.S. at 101); *see also Nagi v. United States*,

90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).

The court must determine whether, in light of the circumstances as they existed at the time of

counsel's actions, "the identified acts or omissions were outside the wide range of professionally

competent assistance."  *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's

performance was outside that range, the defendant is not entitled to relief if counsel's error had no

effect on the judgment.  *Id.* at 691.

     **1.**    **Failure to Argue and Preserve *Batson* Challenge**

        Petitioner first faults counsel for failing to "argue and preserve the *Batson*

challenge." (ECF No. 1, PageID.14.)  Essentially, Petitioner bases his ineffectiveness claim on his

argument set forth with respect to his Fourteenth Amendment argument above.  As discussed above, however, Petitioner's *Batson* claim lacks merit, and "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial."  *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

### 2.     Failure to Object to Prosecutorial Misconduct

Petitioner next argues that counsel was ineffective for failing to object to three different occasions of prosecutorial misconduct.  (ECF No. 1, PageID.14.)  He asserts that counsel should have objected to:  (1) improper vouching and bolstering; (2) the use of false and perjured testimony; and (3) the prosecution's misstatement of evidence during closing arguments.  (*Id.*)  Overall, for claims of prosecutorial misconduct, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  The Court has emphasized a series of factors to be evaluated when making this determination:  (1) whether the comments were isolated or pervasive; (2) whether the comments were deliberately or accidentally put before the jury; (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence; (5) the strength of the overall proof establishing guilt; (6) whether the remarks were objected to by counsel; and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182–83; *United States v. Young*, 470 U.S. 1, 12–13 (1985); *Donnelly*, 416 U.S. at 646–47.  With this background in mind, the Court considers each of Petitioner's arguments below.

a.        **Improper Vouching and Bolstering**

Petitioner first argues that the prosecutor engaged in improper vouching and bolstering with respect to Gibson and the detectives who conducted the investigation.  The federal courts have recognized two types of objectionable vouching.  *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008).  *But see Wogenstahl v. Mitchell*, 668 F.3d 307, 328–29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).  The first type impermissibly places the government's prestige behind the witness to bolster his or her credibility.  *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 2019); *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994).  The second type, also known as bolstering, occurs when the prosecutor invites the jury to believe there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965).

Petitioner first suggests that the prosecutor engaged in improper vouching during opening statements and closing arguments when he spoke about Gibson's truthfulness.  (ECF No. 8-12, PageID.714.)  Specifically, Petitioner takes issue with this statement during the prosecutor's opening statement: "In all the years I've been doing this, I've never seen anybody like him.  And he agreed to testify.  He got nothing in return for his testimony."  (ECF No. 8-4, PageID.321.)  He also takes issue with the prosecutor noting during closing argument that Gibson "had the decency to come forward and tell the truth."  (ECF No. 8-8, PageID.498.)  The prosecutor, however, neither expressed a personal belief in Gibson's testimony nor suggested that he was aware of any facts not presented to the jury.  *See Wogenstahl*, 668 F.3d at 328.  Rather, the prosecutor made arguments— based upon the record—that Gibson had chosen to come forward despite not being promised anything in return.  Counsel, therefore, was not ineffective for failing to raise a meritless objection

24

to these statements. *See Mahdi*, 522 F.3d at 638. Moreover, Petitioner has not demonstrated that the outcome of trial would have differed had counsel raised an objection.

Petitioner also faults counsel for not objecting to the prosecutor's supposed vouching and bolstering of the investigators. (ECF No. 8-12, PageID.714.) Specifically, he takes issue with the fact that, during opening statements, the prosecutor stated, "Mr. Purlee is so engrained in my brain cells, I dreamed about him at night, appearing at the door of my office. It's almost like a bad dream, and Detective Purlee is a great detective." (ECF No. 8-4, PageID.318.) The prosecutor also noted that Detectives Purlee and Smith were "top-notch guys." (*Id.*, PageID.319.) The prosecutor, however, never implied that the jury should reach a certain conclusion because of the investigators' work ethic. Rather, the prosecutor acknowledged how complicated the case was. The prosecutor never expressed a personal belief in the investigators' testimony or suggested that he was aware of any facts not presented to the jury. *See Wogenstahl*, 668 F.3d at 328. Counsel, therefore, was not ineffective for failing to raise a meritless objection to these statements. *See Mahdi*, 522 F.3d at 638. Moreover, Petitioner has not demonstrated that the outcome of trial would have differed had counsel raised an objection.

### b. Use of False and Perjured Testimony

Petitioner argues further that counsel should have objected to the prosecution eliciting false and perjured testimony from Detective Purlee. (ECF No. 8-12, PageID.715.) After the video of Petitioner's investigative subpoena interview was played, the prosecutor recalled Detective Purlee and asked him if the names "Tay" and "Chubbs" had ever come up during the investigation in any other context. (ECF No. 8-7, PageID.466.) Detective Purlee responded that they had not, and that he did not uncover any evidence of Tay's or Chubbs' actual existence. (*Id.*) Petitioner asserts that this testimony was false because on December 3, 2013, Lakisha Kirkwood provided the following testimony at an investigative subpoena hearing:

> I received a phone call from (Clifton) Friday night and we was just talking about the usual, nothing really.  And he asked me to make a phone call.  He asked me to make a phone call for somebody he was around.  I don't know who.  Think he uh, I don't know who actually but he did mention somebody named (Tay), whoever that is.  I don't know who that is.  But he asked me to make a three-way call for (Tay). . . . I made a three-way call for (Tay).

(ECF No. 8-12, PageID.715–16.)  Petitioner also asserts that on June 5, 2014, police questioned Brandon Matthews "in connection with a crime of carrying of a concealed weapon."  (*Id.*, PageID.16.)  Matthews told them "there wasn't a question about him being in possession of the gun and his prints and DNA being on it."  (*Id.*)  Matthews also told police "he has a cousin named 'Tay' whose real name was Deontay Matthews."  (*Id.*)  Petitioner suggests that "[c]learly there was a 'Tay' who was a cousin of Brandon Matthews who was in possession of the murder weapon in this case that was believed to have once been owned by Mr. Isaac."  (*Id.*)

In order to demonstrate that prosecutorial misconduct occurred based upon the presentation of false testimony, a petitioner must demonstrate that (1) the prosecutor presented false testimony; (2) the prosecutor knew the testimony was false; and (3) the testimony was material.  *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009).  Here, Petitioner asserts that the prosecutor knew that Detective Purlee's statement was false because the prosecutor had been present during Lakisha Kirkwood' testimony.  (ECF No. 8-12, PageID.717.)  Petitioner, however, has not demonstrated that Detective Purlee's statement about the names Tay and Chubbs never coming up elsewhere in the investigation was material.  Kirkwood testified that she herself did not know "Tay."  Thus, Detective Purlee testified truthfully when he said that there was no evidence that Tay and Chubbs existed.  Moreover, nothing in the police report regarding Brandon Matthews connects Matthews' cousin Tay to Petitioner and the murder of Hammad.  Petitioner's argument otherwise is based on "a cascade of entirely speculative premises."  *Irick v. Bell*, 565 F.3d 315, 324 (6th Cir. 2009).  Nothing in the record before the Court leads to a conclusion that the

prosecution knowingly presented material false testimony during Petitioner's trial. Accordingly, counsel did not render ineffective assistance by failing to raise a meritless objection to such testimony. *See Mahdi*, 522 F.3d at 638. Moreover, Petitioner has not demonstrated that the outcome of trial would have differed had counsel raised an objection.

### c.       Misstating the Evidence During Closing Arguments

Petitioner also asserts that counsel should have challenged the prosecutor's misstatement of the evidence during closing arguments. During closing arguments, the prosecutor stated: "Mr. Gibson was due to be paroled this month, before he was ever approached by the Grand Rapids Police Department." (ECF No. 8-8, PageID.497.) Petitioner asserts, however, that Gibson was approached by the Grand Rapids Police Department on April 6, 2015, and that at the May 5, 2015, preliminary examination he "testified that he was 'waitin' for a decision at that time.'" (ECF No. 8-12, PageID.717–18.) Petitioner suggests that the prosecutor misstated the evidence because he wanted "the jury to believe that Mr. Gibson was only coming forward" because Petitioner's "arrogance and lack of remorse bothered him." (*Id.*, PageID.718.)

The Court disagrees with Petitioner that the prosecution misstated the evidence during closing arguments. At the very beginning of his testimony during the preliminary examination, Gibson stated that his approximate out-date was October 15, 2015. (ECF No. 8-2, PageID.167.) The fact that he had not yet received official notification from the Michigan Parole Board is of no relevance. Gibson's testimony clearly indicated that he fully expected to be released. The point of the prosecutor's statement was to indicate that because Gibson was fully expecting to be released on parole before he testified at trial, he was not testifying or assisting the prosecution in exchange for assistance in being granted parole. The Court cannot conclude that the prosecutor's statement was inaccurate and amounted to prosecutorial misconduct. Counsel,

therefore, was not ineffective for failing to raise a meritless objection.  *See Mahdi*, 522 F.3d at 638.

> ### 3.      Failure to Challenge Admission of Gibson's Preliminary Examination Testimony

Petitioner next faults counsel for not presenting evidence to demonstrate that the prosecution did not exercise due diligence in trying to produce Gibson at trial.  (ECF No. 1, PageID.14.)  Petitioner asserts that counsel's failure to do so led to violations of his right to a fair trial and his Sixth Amendment Confrontation Clause rights.  (*Id.*)  On direct appeal, the court of appeals rejected Petitioner's assertion that his constitutional rights had been violated because of the use of Gibson's preliminary examination testimony.  (ECF No. 1-1, PageID.26–27.)

Petitioner suggests that counsel should have "shown that Noemi Aguilar was being deceptive at the due-diligence hearing."  (ECF No. 8-12, PageID.721.)  According to Petitioner, Gibson testified at the preliminary examination that his "approximate outdate was October 15, 2015," and that the prosecution was present at that hearing.  (*Id.*)  Petitioner argues that Ms. Aguilar should have known when Gibson would be paroled because she is employed by the Kent County Prosecutor's Office, which has the "burden of 'letting the left hand know what the right hand is doing' or has done."  (*Id.*, PageID.722.)

Counsel cross-examined Noemi Aguilar and elicited the fact that Gibson had never been subpoenaed to testify at Petitioner's trial.  (ECF No. 8-7, PageID.10.)  Counsel also argued that the prosecution had ample time to make Gibson available and did not make efforts to do so until after he had been paroled from custody on October 13, 2015.  (*Id.*)  The arguments made by counsel are substantially the same arguments that Petitioner claims counsel should have made. Ultimately, the trial court determined that the prosecution had sufficiently shown due diligence and declared Gibson to be unavailable.  Petitioner fails to demonstrate that any further argument

by counsel would have caused the trial court to rule another way.  Petitioner, therefore, has not met his burden of overcoming the presumption that counsel's conduct fell "within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.

### 4.  Failure to Present Witnesses and Evidence

Next, Petitioner asserts that counsel was ineffective for failing to present witnesses and evidence at trial.  (ECF No. 1, PageID.14.)  "Decisions as to whether to call certain witnesses or what evidence to present are presumed to be matters of trial strategy, and the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense."  *Collins v. Berghuis*, No. 1:08-cv-369, 2011 WL 4346333, at *16 (W.D. Mich. Aug. 22, 2011) (citing *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004) and *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)).

Petitioner notes that the defense strategy was to assert that he had been set up by Mayberry.  (ECF No. 8-12, PageID.725.)  Petitioner argues that counsel could have questioned Benjamin Donaldson on cross-examination regarding his investigative subpoena testimony that he thought Mayberry was trying to set up his friend and Petitioner.  (*Id.*)  Petitioner also faults counsel for not questioning Donaldson about the statement he had made to police about Mayberry knowing about the murder the night it happened.  (*Id.*)  The Court's review of Donaldson's testimony, however, indicates that Donaldson's testimony was that Mayberry was attempting to set up Hammad to be robbed, not that Mayberry was attempting to frame Petitioner.  (*Id.*, PageID.898–921.)  Moreover, even if Donaldson had discredited Mayberry's testimony by testifying that Mayberry knew of Hammad's murder the night it happened, that point was not crucial to the prosecution's case against Petitioner.  Petitioner simply has not demonstrated that counsel's failure to question Donaldson in this manner prejudiced his defense in any way.

Petitioner also faults counsel for not more "effectively marshal[ing] the evidence in closing." (*Id.*, PageID.726.)  He asserts that counsel could have "much more effectively argued that just because Mr. Mayberry's phone wasn't near the crime scene does not prove that Mr. Mayberry wasn't." (*Id.*)  He also suggests that counsel should have argued that Mayberry could not have met Hammad 30 seconds after Hammad left the corner of Alger and Eastern and that Mayberry could not have been moving away from the crime scene if he was at his sister's house as claimed by Mayberry and Donaldson.  (*Id.*, PageID.727.)  Petitioner also faults counsel for failing to argue that Mayberry and Donaldson "must have gotten together to create a false alibi and that Mr. Mayberry was testifying falsely about using <u>his</u> cell phone that night." (*Id.*)  As discussed *infra*, however, the testimony regarding cell phone records was not a crucial part of the prosecution's case.  During closing arguments, counsel did make a point that Mayberry had set up Petitioner and Hammad, despite describing them as his "friends."  (ECF No. 8-8, PageID.500.)  Petitioner has offered this Court no basis to overcome the presumption that counsel's decision to not focus on the cell phone records more during closing arguments was sound trial strategy.

Petitioner also faults counsel for not questioning Detective DeVries about the fact that the cell phone records showed that neither he nor Winters called Hammad at all on the day of the murder "to call into question Mr. Mayberry's claim that he witnessed [Petitioner] and Mr. Hammad exchange numbers the day before the murder so that they could set up a time and place to meet." (ECF No. 8-12, PageID.727.)  He asserts that had counsel presented more evidence regarding the alleged use of cell phones, "it would have provided unimpeachable physical evidence that would have been consistent with [his] version of events while simultaneously impeaching Mr. Gibson and Mr. Mayberry." (*Id.*)  Again, because the cell phone records were not a crucial part of

30

the prosecution's case against Petitioner, Petitioner has not demonstrated that counsel's decision to not focus more attention on these records was not sound trial strategy.

Next, Petitioner believes counsel should have taken more steps during closing arguments to call Gibson's testimony into question.  (*Id.*, PageID.728.)  According to Petitioner, the prosecutor claimed that they had plenty to charge Petitioner prior to Gibson coming forward. (*Id.*)  Petitioner submits, however, that seven months after his investigative subpoena interview, he had not yet been arrested.  (*Id.*, PageID.729.)  It was only after Gibson came forward did the prosecutor feel "he had enough evidence to arrest [Petitioner] on April 10, 2015." (*Id.*)  Petitioner argues that counsel "should have brought out the fact that [he] was arrested just four days after Mr. Gibson talked with Detective Smith and Purlee" to indicate that "the prosecutor would not have charged [Petitioner] had Mr. Gibson not [come] forward."  (*Id.*)  Petitioner also mentions that counsel should have pointed out that Gibson's testimony that Petitioner called Winters on three separate occasions, which Petitioner asserts occurred while they were both in the Durango makes no sense, and that Gibson's testimony regarding Isaac dropping his car off "somewhere on Jefferson" made no sense if it were only Petitioner and Winters in the Durango.  (*Id.*, PageID.730.)

During closing arguments, counsel called attention to the fact that Gibson initially stated that he did not want anything in exchange for his testimony, but then asked for the police department to send a letter to the Michigan Parole Board so that he could be considered for parole his first time before the Board.  (ECF No. 8-8, PageID.501.)  Counsel argued that Gibson "[knew] the game" and that Petitioner likely did not tell Gibson about anything.  (*Id.*)  Rather, counsel argued, it was more likely that Gibson "looked at [Petitioner's] papers" and decided to write a letter to the investigators.  (*Id.*)  Counsel did point out that Gibson got a "couple . . .things wrong," such as saying that the magazine fell out during the altercation and that a watch was removed from

Hammad's wrist.  (*Id.*)  Overall, counsel asserted that Gibson "lied, under oath."  (*Id.*, PageID.502.)

Counsel's strategy, therefore, was to cast doubt on the entirety of Gibson's testimony.  Petitioner,

therefore, has not demonstrated that counsel's decision to not point out all the inconsistencies noted

above was not sound trial strategy.

Sixth, Petitioner faults counsel for failing to argue during closing arguments that

Petitioner "would not have had time to commit the murder, take the actions after the murder that

Mr. Gibson claimed, and then make it to Cocktailz when Jackie Johnson and Jade Robertson

testified he did."  (*Id.*, PageID.730.)  Petitioner argues that instead, counsel, "chose to impeach

Ms. Johnson with her investigative subpoena testimony where she said that she had left for

Cocktailz at 12:40 to 1:00."  (*Id.*)  According to Petitioner, absent counsel's impeachment, his

arguments would have rebutted the prosecutor's claim that Gibson knew everything about the

crime because Gibson did not know what time Petitioner went to Cocktailz.  (*Id.*, PageID.730–31.)

As noted *supra*, however, testimony provided by Robertson and Johnson did not provide an exact

time as to when they saw Petitioner at Cocktailz.  Petitioner has not overcome the presumption

that counsel's decision to not focus on that timeframe during closing arguments was sound trial

strategy.

Seventh, Petitioner faults counsel for not calling Bertha Nesby as a witness.  (*Id.*,

PageID.732.)  According to Petitioner, Officer Bingel had interviewed Ms. Nesby on September

20, 2013.  (*Id.*, PageID.858.)  Detective Purlee spoke to Ms. Nesby on August 21, 2014, and asked

her about the "black vehicle she reported seeing leaving the scene after hearing someone yell that

they had the money."  (*Id.*)  "Ms. Nesby had little recollection of that night.  About the only thing

she recalled was that a pickup truck had crashed at the bend in the road last Fall."  (*Id.*)  Petitioner

suggests that Ms. Nesby's testimony would have supported his defense that he was set up because

her testimony that the "[perpetrators] were driving a car [would be] exculpatory." (*Id.*)  Use of the word "car" to describe the vehicle in question, however, is not necessarily exculpatory.  Many individuals use "car" generally to describe all types of vehicles, including SUVs.  Petitioner, therefore, has not demonstrated that counsel's failure to call Ms. Nesby prejudiced his defense in any way.

Finally, Petitioner faults counsel for not calling Kenwin Winters and Quinn Isaac to testify or, alternatively, for not asking "all of the officers that testified for the prosecution if Mr. Winters or Mr. Isaac were ever arrested in this matter, to rebut Mr. Stone's claim that they were [Petitioner's] co-conspirators." (ECF No. 8-12, PageID.733.)  Petitioner asserts that Winters and Isaac were never "arrested or given use immunity in relation to the robbery/homicide of Rick Hammad." (*Id.*)  He also avers that counsel should have asked Detective DeVries why he did not research the location of the cell phones used by Winters and Isaac that evening.  (*Id.*, PageID.734.)

Petitioner has not demonstrated that it was not outside the realm of reasonable trial strategy for counsel to not call Winters and Isaac as witnesses.  Petitioner has not demonstrated how testimony regarding Winters and Isaac's involvement would have helped his defense in any way.  Isaac was questioned after his arrest on an unrelated shooting.  (*Id.*, PageID.861.)  During that questioning, Isaac said that he had information about a homicide.  (*Id.*)  He said he was not present when it occurred, "but he knew it involved a .45 caliber and there was 2 pounds of marijuana involved." (*Id.*)  Isaac was reluctant to say more, but eventually provided the following information:

> Quinn Isaac told me he was contacted one night by a guy he knew as Kenwin.  He said Kenwin was the brother of his baby's mother, Shaniqua.  Quinn said Kenwin asked to use his firearm that night and would give him $100 and an ounce of marijuana in exchange.  Quinn mentioned at one point he only agreed because he needed the money.

Quinn said he met Kenwin that night at the church parking lot at the corner of Burton St. and Francis Ave.  Quinn said he arrived there in Shaniqua's car and Kenwin arrived with someone he knew as "Bay Bay."  Quinn knew that Kenwin and Bay Bay were cousins.  He did not know Bay Bay's real name but he said he was considerably older tha[n] Kenwin.  Quinn said he believed Bay Bay had been to prison before for attempted murder and he knew he was currently incarcerated.  Quinn said he knew Bay Bay was incarcerated because he heard it from Kenwin.  Quinn said he had seen Kenwin just a few days ago in Georgia and Kenwin learned that his father, Kenwin Sr., was locked up in prison with Bay Bay back in Michigan.  Quinn believed Kenwin's father had called him from prison to tell him this.

On the night that Quinn loaned his gun to Kenwin he said Bay Bay and Kenwin arrived in a black or dark blue SUV.  Quinn thought the vehicle was a Durango.  He said Bay Bay was driving and Kenwin was in the passenger seat.

. . .

Quinn told me he got the pistol back from Kenwin that night and he claimed he later sold it to someone else.

I asked Quinn if he knew what happened to the firearm that Bay Bay had the night, or his clothes.  Quinn said he didn't know what happened to them but he asked me if I knew about Bay Bay leaving town shortly after the murder.  I told him that I was aware of that.

I asked Quinn if he was present when this murder happened and he insisted he was not.  I asked who else was with Bay Bay and Kenwin and he said it was just those two.

(*Id.*, PageID.861–62.)  Winters also appeared to testify via an investigative subpoena.  He indicated that Bay Bay is Petitioner's nickname.  (*Id.*, PageID.942–43.)  When asked, he denied any knowledge of the homicide.  (*Id.*, PageID.944.)  He testified that it would be "incorrect" if officers said they had received information that he took part in the homicide or was approached by "Bay Bay to take part in it."  (*Id.*, PageID.945.)  Winters also, testified, however, that Petitioner had called him the night of the homicide to ask if Winters wanted to buy some marijuana.  (*Id.*, PageID.948–49.)  Officers also showed Winters records indicating that Petitioner called him five times on the night of the murder.  (*Id.*, PageID.951.)

Petitioner has not demonstrated that counsel's decision to not call Isaac and Winters as witnesses or to ask other witnesses about why they were not arrested and charged as well fell outside the realm of reasonable trial strategy.  Nothing set forth above suggests that testimony provided by Isaac and Winters would have assisted Petitioner's defense in a substantial way.  The fact they were not charged with crimes stemming from the homicide does not suggest Petitioner's innocence.

### 5.    Failure to Challenge Ann Hunt's DNA Testimony

Petitioner also faults counsel for failing to object to the admission of Ann Hunt's testimony regarding DNA analysis or for failing to force the prosecution to present the lab report to the jury.  (ECF No. 1, PageID.14.)  Petitioner suggests that Hunt's testimony was inadmissible absent any "interpretive evidence regarding the likelihood of a potential match."  (ECF No. 8-12, PageID.736.)   He also suggests that there was no report admitted regarding the testing methodology used and Hunt's conclusions and interpretations of the data.  (*Id.*)  Petitioner maintains that defense counsel should have moved against the admission of Hunt's testimony because it allowed the prosecutor to argue that Petitioner was not excluded as a donor of the DNA. (*Id.*, PageID.737.)

During trial, Hunt provided thorough testimony regarding the method she used to test the various DNA swabs.  (ECF No. 8-7, PageID.431–33.)  Overall, Hunt's testimony did not establish that Petitioner's DNA was matched to anything.  Rather, the most that Hunt could say was that Petitioner was not excluded as a donor with respect to certain samples.  (*Id.*, PageID.433– 34.)  During cross-examination, Hunt acknowledged that when saying that something is inconclusive, it is possible that a "sample you're trying to compare it to is not there."  (*Id.*, PageID.435.)  DNA evidence was not a crucial part of the prosecution's case against Petitioner. Petitioner has not described, and the Court does not discern, how counsel's failure to object to the

admission of Hunt's testimony or request that the lab report be admitted prejudiced him in any way.  *See Strickland*, 466 U.S. at 691.

### 6.      Failure to Rebut Expert Testimony Regarding Cell Phone Analysis

Petitioner next asserts that counsel was ineffective for failing to consult the "available literature" to rebut Detective DeVries' testimony regarding cell phone analysis. (ECF No. 1, PageID.14.)  Specifically, Petitioner objects to the detective's testimony that a cell phone will always connect to the tower that is physically closest to it.  (ECF No. 8-12, PageID.739.) Petitioner maintains that if counsel had conducted an adequate investigation of scientific journals, he could have rebutted that testimony with evidence that cell phones connect to the tower with the strongest signal, which is often, but not always, the closest tower.  (*Id.*)

Petitioner has not demonstrated that counsel's conduct fell outside the wide realm of reasonable professional assistance.    During cross-examination, Detective DeVries acknowledged that he could track devices, not people, and that the cell phone records only gave an indication of where a certain device was located.  (Doc. No. 8-8, PageID.493.)  The evidence regarding cell phone analysis was not a crucial part of the prosecution's case against Petitioner. Moreover, considering the overwhelming evidence of Petitioner's guilt, the Court cannot conclude that counsel's failure to rebut Detective DeVries' testimony in the way Petitioner wanted had any effect on the jury's verdict.  *See Strickland*, 466 U.S. at 691.

### 7.      Cumulative Error

Finally, Petitioner suggests that even if "individually the above claims of ineffective assistance of counsel do not establish that [he] was prejudiced by counsel's actions, . . . the cumulative effect [of such actions] does."  (ECF No. 1, PageID.14.)  The Court must consider the cumulative effect of such errors because "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a

trial setting that is fundamentally unfair." *United States v. Hughes*, 505 F.3d 578, 597 (6th Cir. 2007) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)).   "Thus, examining an ineffective assistance claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)).   However, as discussed *supra*, the Court has concluded that Petitioner has failed to demonstrate that counsel was constitutionally deficient in any way.   Thus, because Petitioner's individual claims of ineffective assistance lack merit, he cannot show that any alleged cumulative error violated his constitutional rights.   *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

In sum, Petitioner has not demonstrated that trial counsel rendered constitutionally ineffective assistance.   Habeas ground II will, therefore, be dismissed.

### C.    Entitlement to New Trial Based on New Evidence

In habeas ground III, Petitioner maintains that he is entitled to a new trial based upon new evidence that Kenwin Winters and Quinn Isaac were never arrested for the same crimes. (ECF No. 1, PageID.16.)   Petitioner maintains that his "rights to a fair trial are being violated and a miscarriage of justice is being done by the lower courts." (*Id.*)   According to Petitioner, this evidence calls into question the credibility of testimony provided by Gibson and makes it more likely that a reasonable juror would not have convicted Petitioner had the jury known that the prosecution thought there was insufficient evidence to secure convictions against Winters and Isaac.   (ECF No. 9, PageID.1012–1013.)   Essentially, Petitioner maintains that he is actually innocent based upon the fact that Winters and Isaac were never arrested for the same offenses.

Petitioner's claim of actual innocence fails to state a cognizable federal claim.   In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court stated:   "Claims of actual

innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House*, 547 U.S. at 555 ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup*, 513 U.S. at 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not

itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free- standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. The Sixth Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera*); *Cress*, 484 F.3d at 854 (citing cases). Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Moreover, Petitioner's argument that Winters and Isaac were never arrested for the offenses at issue falls far short of demonstrating that Petitioner himself is actually innocent of the crimes for which he was convicted. Petitioner, therefore, cannot obtain habeas corpus relief on his freestanding claim of actual innocence. Petitioner's third habeas ground will accordingly be dismissed.

###### D.     Ineffective Assistance of Appellate Counsel

Petitioner's final ground for relief is that appellate counsel rendered ineffective assistance for failing to raise the three grounds asserted above on direct appeal.  (ECF No. 1, PageID.18.)

The *Strickland* standard that applies to trial counsel also applies to appellate counsel.  However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal.  Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

In denying Petitioner's motion for relief from judgment, the trial court noted:

> Defendant states that the three issues raised in his Motion for Relief from Judgment are stronger than the argument[s] raised on appeal by appellate counsel.  Defendant does not [show] that appellate counsel's performance fell below an objective standard of reasonableness.  Appellate counsel is not required to argue every issue requested by Defendant and Defendant has not shown that the issues he now raises are clearly stronger or likely to prevail.  Additionally, there is not a reasonable probability that, but for the alleged error, the results would have been different.

(ECF No. 1-1, PageID.34.)  Despite Petitioner's argument, the trial court's rejection of this claim is neither contrary to, nor an unreasonable application of, *Strickland*. *See Moore v. Mitchell*, 708

40

F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781–82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). Habeas ground IV will, therefore, be dismissed.

## V.      Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner

a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.


Dated:   February 28, 2022              /s/ Robert J. Jonker
                                         ROBERT J. JONKER
                                         CHIEF UNITED STATES DISTRICT JUDGE